**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| STARION ENERGY INC., <u>et al.</u>,[1] | Case No. 18-12608 (___) |
| Debtors. | (Joint Administration Requested) |

## <u>DECLARATION OF THOMAS STINER IN SUPPORT OF FIRST DAY MOTIONS</u>

I, Thomas Stiner, hereby declare under penalty of perjury:

1.      I am the Controller of Starion Energy, Inc. and its affiliated entities (collectively, the "**Debtors**" or "**Starion**"), a corporation organized under the laws of the State of Delaware with its principal place of business in Middlebury, Connecticut.

2.      I have been serving as Controller of the Debtors since approximately 2010

3.      I submit this declaration ("**Declaration**") in support of the Debtors' chapter 11 bankruptcy petitions and in support of the Debtor's "first day" motions and applications, described in further detail below (collectively, the "**First Day Motions**").  I am over 18 years of age and am competent to make this Declaration and testify to the facts set forth herein.

4.      I, or those employees of the Debtors under my supervision, am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with current and former officers and other members of the Debtors' management team, senior personnel, and advisors, my review of relevant documents and

---

[1] The Debtors and the last four digits of their respective tax identification numbers are: Starion Energy Inc. (0943); Starion Energy NY Inc. (4319); Starion Energy PA Inc. (1201). The Debtors' corporate headquarters is located at, and the mailing address for each Debtor is, 751 Straits Turnpike, Suite 2000, Middlebury CT 06762, Attn: Alexandrea Isaac, Esq.

information concerning the Debtors' operations and financial affairs as well as the Debtors' books and records, or my opinions based upon my experience and knowledge.  If called as a witness to testify in this matter, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.      On the date hereof (the "**Petition Date**"), the Debtors filed their voluntary petitions (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") commencing the above-captioned bankruptcy cases (the "**Cases**").  It is anticipated that the Debtors will continue to manage their affairs and operate their businesses as debtors and debtors-in-possession pursuant and subject to the requirements of sections 1107(a) and 1108 of the Bankruptcy Code.

6.      I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly transition of the Debtors into these Cases and permit the Debtors to achieve their bankruptcy objectives as further described below.

7.      Part I of this Declaration describes the Debtor's business, capital structure and the events leading to the filing of the Petition.  Part II of this Declaration sets forth the First Day Motions[2] and sets forth the relevant facts in support of those motions.

**Background**

**A.  History of the Debtors**

8.      Founded in 2009 in Southbury, Connecticut, the Debtors are a leading supplier of electricity and natural gas offering competitive solutions to residential and business customers in

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

restructured energy markets allowing customers to shop among competitive and alternative options for their energy supply service.

9.      Starting in 2010, The Debtors began offering retail electricity to consumers in Connecticut and New York. The Following year, in 2011, the Debtors began offering electricity products in Maryland and Pennsylvania before expanding its retail electricity business to include Illinois, Ohio, New Jersey, and the District of Columbia in 2013. The Debtors then added Delaware to their retail electricity portfolio in 2013.

10.      Later in 2013, the Debtors launched their retail natural gas business in New York. In 2014, the Debtors began to offer retail electricity in Massachusetts, and spread into Ohio in 2015.

11.      Since 2017, the Debtors have been granted licenses to serve natural gas to serve natural gas in Michigan and electricity in Rhode Island, but have not yet begun service customers in those markets.

12.      As an A+ rated member of the Better Business Bureau, the backbone of Starion's business is their commitment to providing customer service and rewarding customer loyalty.  The Debtors are also passionate about their commitment to the community, regularly supporting a variety of charitable organizations

**B. Debtor's Business Operations**

13.      The Debtors offer several product options including fixed and variable rate pricing plans and renewable energy product options.

14.      Specifically, the Debtors maintain key relationships with various independent system operations ("ISOs") allowing them to distribute power to distributions. Of those relationships, the Debtors work with the following:

- In New England, the Debtors maintain a relationship with ISO New England.

- The Debtors have a contract with Emera Energy Services to purchase the power load required to service its electricity supply to customers in Connecticut and Massachusetts.

- The Debtors purchase power directly through the NY ISO for the power load required to serve its electric power customers in New York. The Debtors purchase power directly from PJM ISO for the power load required to serve its electrical power customers in Delaware, the District of Columbia, Illinois, Maryland, New Jersey, Ohio and Pennsylvania.

- The Debtors have a contract with Cima for its natural gas purchases required to serve the Debtors' natural gas supply customers.

15.      As of November 14, 2018, the Debtors employed a total of 27 employees, including 24 salaried Full Time Employees and 3 hourly Full Time employees.  None of the Debtors' employees are represented by a labor union.

16.      The Debtors' corporate headquarters is located at 751 Straits Turnpike, Suite 2000, P.O. Box 845, Middlebury, CT 06762.

### C. Organizational Structure, Governance, and Current Management

17.      Debtor Starion Energy Inc. is a privately-held Delaware corporation incorporated in 2009. Debtors Starion Energy NY Inc. and Starion Energy PA, Inc. are wholly owned subsidiaries of Starion Energy Inc.

18.      The Debtors each have a single member board of director comprised of Ruzhdi Dauti.  The Debtors' current management consists of myself, Thomas Stiner, Controller; Duane Gereski, Director of Marketing; Steven Haigh, Chief Information Officer; Alexandrea Isaac, General Counsel; Robert Bassett, Director of Compliance and Regulatory Affairs; Peter Muzsi, Director of Sales Management and Strategy; and Lisa Schmidt, Corporate Office Manager.

19.     The Debtors also maintain three Principals overseeing management, but working under the supervision of Mr. Dauti. Fitor Mamudi, Dashmir Murtishi, and Robert Zappone all serve as principals of the Debtors.

**D.  Capital Structure**

20.     As of November 14, 2018, the company had $6,505,000.00 of outstanding loans owing to four individuals and Loanstars, LLC.

21.     As of November 14, 208 2018, the company had approximately $1,030,500.00 in trade payables.

22.     As of November 14, 2018, the Debtors had 647,190 outstanding shares.

**E.  Circumstances Leading to Chapter 11 Filing.**

23.     **Massachusetts Attorney General Litigation** – On October 15, 2018, the Commonwealth of Massachusetts filed suit against Debtor Starion Energy, Inc. and others in the Superior Court of Massachusetts, Civil Action No. 18-3199H, alleging unfair or deceptive acts or practices in violation of G.L. c. 93A consumer protections act, breach of the covenant of good faith and fair dealing, and violation of the Massachusetts Telemarketing Solicitation Act. Contemporaneously with the filing of their complaint, the Commonwealth filed an Emergency Motion for Attachment on Trustee Process to attach assets of Debtor Starion Energy, Inc. held by National Grid and Eversource, and an Emergency Motion for Preliminary Injunction.

24.     By filing the complaint and the motions, the Commonwealth of Massachusetts sought to secure credits due to Debtor Starion Energy, Inc. that are generated with NSTAR Electric Company d/b/a Eversource Energy ("**Eversource**") and Massachusetts Electric Company d/b/a National Grid ("**National Grid**") in the ordinary course of Massachusetts' purchase of receivables program. The Motion for Attachment sought to attach credits that were in the current position of

National Grid and Eversource, and the Motion for Preliminary Injunction requested an order authorizing and requiring National Grid and Eversource to hold as additional security for the Commonwealth credits due to Starion that would come into National Grid and Eversource's possession in the future. In total, the Commonwealth sought to secure $30.6 million through its two motions.

25.      On October 24, 2018, the Superior Court granted the Commonwealth's Motions, ordering that the injunction will remain in full force and effect until November 12, 2018 at 5:00 PM or further order of the court. On November 13, 2018, the court issued a Second Extension ordering that the injunction will remain in full force and effect until November 16, 2018 at 5:00 P.M. or by further order of the court.

26.      As of November 13, 2018, National Grid held $2,478,936.33 of Starion's assets. As of November 5, 2018, Eversource held $1,094,162.02 in Starion's assets. Thus, as of November 13, 2018, a total of $3,573,098.35 in Starion's assets were being held.

27.      The grant of the attachment and injunction against payment of Starion's funds in the possession of National Grid and Eversource has put severe strain on Starion and will put Starion out of business, and approximately twenty-seven people will be out of work as a result. Starion must purchase energy on the wholesale market in order to supply energy to its customers, and the approximate monthly cost for Starion to purchase this energy varies by month, which totaled $17.8 million for the first eight months of 2018 for Massachusetts customers alone, excluding the costs of Renewable Energy Certificates. Starion must use the funds it receives to pay the millions of dollars in costs each month required to purchase wholesale energy. Without funds, it cannot purchase energy and thus cannot supply energy to its customers. It is essential that Starion receive the $30.6 million due to it in order to keep its business running.

**First Day Motions**

28.    The Debtors filed the First Day Motions contemporaneously herewith to ensure that the Debtors' business continues to function during the Cases.  For the reasons set forth below, the relief requested in the First Day Motions is necessary to (i) stabilize the Debtors' business operations, (ii) operate with minimal disruption during the pendency of the Cases, (iii) maintain value as a going concern, and (iv) facilitate the efficient and economical administration of the Cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[3]

**A.  Joint Administration Motion**

29.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of the Chapter 11 Cases and the consolidation thereof for procedural purposes only. Given the integrated nature of the Debtors' operations, joint administration of the Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

30.    Many of the motions, hearings, and orders in the Cases will affect each and every Debtor entity, as the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors. The entry of an order directing joint administration of the Cases will reduce fees and costs by avoiding duplicative filings and objections. Joint administration of the Cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of thirteen independent chapter 11 cases. The three Debtors in the Cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. The Debtors also share significant debt obligations that they seek to restructure as part of the Chapter 11 Cases.

31.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue

---

[3]    Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

to manage their business operations in chapter 11 without disruption.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

**B. Cash Management Motion**

32.    In the ordinary course of its business, Debtors maintain a cash management system (the "**Cash Management System**"), which includes all activities necessary and pertinent to collecting and disbursing the Debtors' cash assets.  The Cash Management System allows the Debtors to efficiently identify their cash requirements and transfer cash as needed to respond to these requirements.  The Cash Management System is important to the efficient execution and achievement of the Debtors' business objectives, and, ultimately, to maximizing the value of the Debtors' estates.

33.    The Cash Management System generally operates similarly to the centralized cash management systems used by other companies to manage their cash in a cost-effective, efficient manner.  A chart depicting the flow of funds in the Cash Management System is attached to the Cash Management Motion.

34.    The Cash Management System consists of five bank accounts (the "**Bank Accounts**"), which are maintained at KeyBank and Peoples United Bank.  Exhibit B contains a list of all of the Debtors' Bank Accounts.  In addition to the Bank Accounts, the Debtors control a Commission Account (defined below) used to incentivize sales and promote growth

**The Bank Accounts**

35.    As of the Petition Date, the Debtors maintained the following Bank Accounts:

- Main Operating account [KeyBank Account Number: XXXXXX0045] from which most all disbursements and deposits are made;

- Peoples Bank account [Peoples Bank Account Number XXXXXX4138] a local bank for convenience banking;

-   LOC Account 1 [KeyBank Account Number XXXXXXXX0298] holding restricted funds supporting various letters of credit;

-   LOC Account 2 [KeyBank Account Number XXXXXXXX0306] holding restricted funds supporting various letters of credit;

-   LOC Account 3 [KeyBank Account Number XXXXXXXX0314] holding restricted funds supporting various letters of credit;

36.     Additionally, the Debtors maintain approximately $13,000.00 in prepaid debit cards and $17,000 in an account held with Payoneer Inc. (Account Number XX246), an account used to make commission payments in conjunction with certain marketing arrangements (the "Commission Accounts").

**C. Wage Motion**

37.     In the Wage Motion, the Debtors request that the Court enter an order authorizing, but not directing, the Debtors, in their sole discretion: (a) to pay to the Employees all accrued prepetition wages, salaries, and other amounts described more fully below (collectively, the "**Employee Claims**"); (b) to honor any prepetition obligations in respect of, and to continue to honor in the ordinary course of business until further notice (but not assume), certain of the Debtors' paid time off, and holiday time policies, workers' compensation and employee and retiree benefit plans and programs, and employee agreement payments (collectively, the "**Employee Benefits**"), as described below; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "**Employee Expenses**"); (d) to remit all related prepetition payroll taxes (the "**Payroll Taxes**") and other deductions (the "**Employee Withholdings**"); and (e) to the extent that any Employee Benefit is administered, insured, or paid through a third-party administrator or provider, to pay any prepetition claims of such administrator and provider in the ordinary course of business to ensure the uninterrupted delivery of payments or other benefits to the

Employees (collectively with the Employee Claims, the Employee Benefits, the Employee Expenses, the Payroll Taxes, and the Employee Withholdings, the "**Prepetition Employee Obligations**").

38.     The Debtors also request an order authorizing the Banks to honor and process checks, and electronic transfer requests related to the foregoing

1.     <u>Payroll and Ordinary Course Compensation</u>

39.     The Debtors' workforce is comprised of full-time salaried employees and full-time hourly employees (collectively, the "**Full Time Employees**").  As of the Petition Date, the Debtors employ approximately 27 Full Time Employees.  All of the Debtors' Employees are stationed in Middlebury, Connecticut.

40.     All Employees are paid weekly on Fridays (the "**Pay Day**").  The Salaried Employees are paid for the 40 regular hours ending on the prior week and the Hourly Employees are paid one week in arrears to account for the hours worked through the Friday immediately preceding the Pay Day.  Payroll to the Employees is funded in net to Paychex, Inc. ("**Paychex**"), the Debtors' third-party payroll administrator, through ACH on the same day as the Pay Day, and Paychex is responsible for distributing net pay to the Employees from its own accounts.  The Debtors' most recent prepetition payroll date was November 9, 2018. It covered the pay period from October 28, 2018 through November 3, 2018 for the Employees.  The total amount of the November 9, 2018 payroll was approximately $68,000.00. The Debtors' next scheduled payroll date is November 16, 2018 and will cover the pay period from November 4, 2018 through November 10, 2018.  Consistent with the ordinary course of dealings between the Debtors and Paychex, funds in respect of this pay period have not yet been withdrawn from the Debtors' account.  The Debtors expect that postpetition, weekly payroll

expenses through the first thirteen weeks of this Case will be in the range of approximately $68,000.00, subject to any postpetition reduction in workforce.

41.     The Debtors' ability to maximize the value of the estates for all stakeholders depends on the expertise and continued enthusiasm and service of the Debtors' Employees. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the morale and performance of the Employees may be adversely affected.  If the Debtors fail to pay the Employee Claims in the ordinary course, the Employees will suffer personal hardship and, in some cases, may be unable to pay their basic living expenses.  This outcome would have a negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby causing immediate and irreparable harm to the Debtors and their estates.

42.     The Debtors believe that, as of the Petition Date, there are no earned, but unfunded obligations with respect to Employees on account of accrued prepetition wages and salaries.

43.     The Debtors seek to continue to pay postpetition costs of the Employee Claims in the ordinary course during the pendency of these Cases (for the avoidance of doubt, no bonus or incentive payments will be made to any insiders unless separately authorized by the Court).

44.     The Debtors pay Paychex approximately $400.00 per month for its administrative services (the "**Payroll Processing Fee**"). The Payroll Processing Fee is funded concurrent with the funding of the payroll.  As of the Petition Date, the Debtors believe that no amount is owing in respect of the Payroll Processing Fee.   The Debtors seek authority to continue to make payments in respect of the Payroll Processing Fee postpetition in the ordinary course during the pendency of the Case.

2.   The Employee Agreements with Non-Insider Employees

45.     The Debtors maintain employee agreements with four members of its key management.

3. <u>Paid Time Off</u>

46.     Absent an employment contract to the contrary, all Full Time Employees are eligible for vacation time. Employees shall be eligible for 1-week paid vacation after 6 months of employment. An employee earns a second week of vacation after two years, and a third week after five years. Employees are provided with three 8-hour days per year for sick leave. Employees are eligible for sick time after six months of service. Sick leave does not accumulate year-to-year. Employees receive three (3) 8-hour days per year of personal time. Personal time does not accumulate year to year (collectively, "**PTO**").

47.     In the ordinary course of business, all unused PTO time accrued prior to the Petition Date, but not to make cash payments on account of accrued but unused PTO, except at separation of employment and where required by state law.

48.     Except as set forth in the following paragraph, the amount owed to any individual Employee on account of prepetition Employee Claims for such Employee's accrued wages, severance, and PTO does not exceed $12,475 and is not in respect of any time period more than 180 days before the Petition Date.

4. <u>Employee Benefit Plans</u>

49.     Prior to the Petition Date, the Debtors offered Full Time Employees ("**Eligible Employees**"), various standard employee benefits (the "**Benefit Programs**") including, without limitation, (a) medical and prescription drug coverage, (b) dental insurance, (c) 401(k), (d) COBRA coverage, (e) flexible spending accounts, (f) life insurance, (g) short-term and long-term disability insurance, (h) certain paid holidays, (i) performance bonuses, and (j) educational assistance.  Such benefits are administered pursuant to plans, programs, and

policies that cover the Debtors' Eligible Employees.  The amounts set forth below reflect the approximate prepetition cost of such Benefit Programs, which the Debtors seek to continue in the ordinary course of their business.

50.    <u>Medical Insurance Program</u>.  The Debtors offer a medical and prescription drug program (the "**Health Plan**") to Eligible Employees, which is administered by Anthem BlueCross BlueShield. The Health Plan is approximately 82% paid by the Debtors and 18% paid by the Debtors' Eligible Employees through payroll withholding.  Payments in respect of Health Plan premiums are remitted in full by the Debtors, and Employee contributions are subsequently recovered by the Debtors during the payroll process.  The average monthly cost to the Debtors (without considering amounts paid from Employee withholding) of maintaining the Health Plan, has been approximately $37,000.00.  As of the Petition Date, the Debtors believe that no amount is owed in respect of the Health Plan.  However, out of an abundance of caution, the Debtors seek authorization to pay prepetition amounts in respect of the Health Plan in an amount not to exceed $40,000.00 in the aggregate.  The Debtors seek authorization to continue to pay postpetition costs of the Health Plan in the ordinary course during the pendency of these Cases.

51.    <u>Dental Insurance Program</u>.  The Debtors offer a dental program (the "**Dental Plan**") to Eligible Employees, which is administered by Principal.  The Dental Plan is approximately 0% paid by the Debtors and 100% paid by the Debtors' Eligible Employees through payroll withholding and therefore the Debtors do not make any cash payments on account of Dental Insurance, however, the Debtors do pay Principal approximately $2,000 per month in Dental Insurance, which amounts are later collected from the Eligible Employees on a weekly cycle.

52.     <u>Life, Disability, and Related Insurance Coverage</u>.  The Debtors provide Eligible Employees with company-funded short-term and long-term disability insurance, accidental death and dismemberment insurance, and basic life insurance, which are all insured by Guardian Life Insurance Company of America (the "**Life and Disability Plans**").  The Debtors pay 100% of the costs of the Life and Disability Plans.  In the aggregate, the average monthly cost to the Debtors of maintaining the Life and Disability Plans has been approximately $4,000.00.  As of the Petition Date, the Debtors believe that no amount is owed in respect of the Life and Disability Plans.  However, out of an abundance of caution, the Debtors seek authorization to pay prepetition amounts in respect of the Life and Disability Plans in an amount not to exceed $5,000.00 in the aggregate.  The Debtors seek authorization to continue to pay postpetition costs of the Life and Disability Plan in the ordinary course during the pendency of these Cases.

53.     <u>COBRA</u>.  The Debtors seek to continue to perform in the ordinary course any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("**COBRA**") in respect of Employees and their covered dependents whether terminated prior to or after the Petition Date.  The former Employees pay 100% of the premiums for COBRA benefits (plus a 2% administration fee), and the Debtors therefore do not make any cash payments on account of COBRA benefits.  Notwithstanding that Debtors do not pay for Employees' COBRA benefits, Debtors' request to continue premium payments for Health, Dental and Vision Benefits (see 18-20) is also necessary so that terminated Employees who are eligible for and elect COBRA benefits will have a plan to pay into.

54.     <u>Supplemental Insurance</u>.  The Debtors offer Eligible Employees supplemental insurance administered by Principal (the "**Supplemental Insurance**").  Employees pay 100% of

the premiums for Supplemental Insurance via payroll withholding, and the Debtors therefore do not make any cash payments on account of Supplemental Insurance.

55.     <u>Flexible Spending Accounts</u>.  The Debtors offer Eligible Employees the use of flexible spending accounts for various medical claims not otherwise covered or payable by the Health Plan and for dependent claims.  The flexible spending benefits (the "**Flex Benefits**") are administered through a Third-Party Administrator Logical Deductions.  Debtors pay for administration of the Flex Benefits plans (the "**Flex Benefits Fee**") as part of its administrative fee to Logical Deductions which totals $2,000.00 per month.  As of the Petition Date, the Debtors believe no amount is owed in respect of the Flex Benefits Fee.  However, out of an abundance of caution, the Debtors seek authorization to pay prepetition amounts in respect of the Flex Benefits Fee in an amount not to exceed $2,000.00 in the aggregate.  The Debtors seek authorization to continue to pay postpetition costs of the Flex Benefits Fee in the ordinary course during the pendency of these Cases.

56.     <u>Paid Holidays</u>.  The Debtors offer paid holidays for Full Time Employees in observance of both federal, and, in some cases, state holidays (the "**Paid Holidays**").  Employees are paid eight hours for Paid Holidays if they do not work on such holiday, or may apply the Paid Holiday to a different day if the employee works on such holiday.  As of the Petition Date, the Debtors believe that no amounts are owed to Employees in respect of Paid Holidays.  The Debtors seek authorization to continue to pay postpetition costs of the Paid Holidays in the ordinary course during the pendency of these Cases.

57.     <u>Retirement Plans</u>. The Debtors maintain a 401(k) plan that provides for Employee contributions and an employer match, capped at 5% per calendar year. It is anticipated that $138,543.00 has been contributed year-to-date. The Debtors expect that postpetition, weekly

401(k) plan match through the first thirteen weeks of this Case will be in the range of approximately $4,000.00 per week, subject to any postpetition reduction in workforce. Additionally, the 401(k) Plan Administrator, Paychex, conducts a calculation to determine an additional deposit, made 100% by the Debtor, which satisfies Section 415 of the Internal Revenue Code.  The Debtors seek authorization to continue to pay postpetition costs of the Retirement Plan in the ordinary course during the pendency of the Case.

58.    Performance Bonus. The Debtors offer performance bonuses to their Employees at the discretion of management, depending on the Debtors' and the Employee's performance. The Debtors seek authorization to continue to pay postpetition costs of the Performance Bonus program in the ordinary course during the pendency of these Cases.

59.    Educational Assistance.  The Debtors offer to pay for Employee's higher and continuing education directly related to an employee's present job or which will help an Employee prepare for a more responsibilities or promotions within the organization.  Approval and terms of reimbursement are at the Debtors' discretion. The Debtors seek authorization to continue to pay postpetition costs of the Educational Assistance plan in the ordinary course during the pendency of the Case.

5.  Workers' Compensation Program

60.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide its Employees with coverage for injury claims arising from or related to their employment with the Debtors.   The Debtors maintain a workers' compensation benefits program through National Fire Insurance of Hartford, a CNA company (the "**WC Program**").  The WC Program provides benefits to all the Debtors' Employees for claims arising from or related to the Employee's employment with the Debtors.  The premium for the WC Program is paid on an annual basis, and is approximately $8,945.00.  As of the

Petition Date, the Debtors believe that no amount is owed in respect of the WC Program. However, out of an abundance of caution, the Debtors seek authorization to pay prepetition amounts in respect of the WC Program in an amount not to exceed $8,945.00 in the aggregate. The Debtors seek authorization to continue to pay postpetition costs of the WC Program in the ordinary course during the pendency of these Cases.

  7. <u>Employee Expenses</u>

  61. Prior to the Petition Date, the Debtors directly or indirectly reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "**Employee Expenses**"). The Employee Expenses are incurred in the ordinary course of the Debtors' business operations and include, without limitation, expenses for meals, travel, lodging, and other business-related expenses. Historically, approximately $17,000.00 has been paid by the Debtors on account of Employee Expenses each month. Because a delay often occurs between the time such expenses are incurred and the time an expense reimbursement request is submitted, it is difficult to determine with precision the aggregate amount of outstanding Employee Expenses. However, the Debtors estimate that, as of the Petition Date, approximately $15,000 in Employee Expenses remain unpaid.

  62. Absent authority to pay the Employee Expenses incurred prepetition, the Debtors' Employees could be obligated to pay such amounts out of their personal funds, which would be unfair and would hurt morale, likely resulting in Employee turn-over or performance issues that would cause immediate and irreparable harm to the Debtors and the estates. The Debtors therefore seek authority to pay outstanding prepetition Employee Expenses in an amount not to exceed $15,000.00 in the aggregate, and to continue the foregoing policy in the ordinary course during the pendency of these Cases.

8.  Employee Withholdings and Payroll Taxes

63.     The Debtors' payroll administrator, Paychex, routinely deducts certain amounts directly from Employees' compensation that represent earnings that judicial or government authorities or the Employees have designated for deduction, including, for example, various federal, state and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs contributions, benefit plans insurance programs, and other similar programs.

64.     The Debtors are responsible for remitting to Paychex, for its own account, various taxes and fees associated with payroll pursuant to the FICA and federal and state laws regarding unemployment and disability taxes ("**Payroll Taxes**").  The Debtors have paid approximately $7,500.00 in the aggregate for employer-obligated Payroll Taxes each pay period.  The Debtors seek authority to deduct and remit Payroll Taxes, in an amount not to exceed $7,500.00 in the aggregate, and to continue to deduct and remit the Employee Withholdings and to remit the Payroll Taxes in the ordinary course during the pendency of the Cases.

**D.  Utilities Motion**

65.     Pursuant to the Utilities Motion, the Debtors are seeking entry of an interim order and final order (i) prohibiting the Debtors' utility providers (each a "**Utility Provider**" and collectively, the "**Utility Providers**") from altering, refusing, or discontinuing service to the Debtors, except as set forth therein, (ii) deeming the Utility Providers adequately assured of future performance, (iii) establishing procedures for resolving requests for additional adequate assurance of payment and authorizing the Debtors to provide additional or alternative adequate assurance of future payment to the Utility Providers, and (iv) granting related relief, including scheduling a hearing to consider approval of this Motion on a final basis.

66.     To operate their businesses and manage their properties, the Debtors incur utility expenses for natural gas, electricity, waste management, local and long-distance telecommunications, data, wireless, and other similar services (collectively, the "**Utility Services**").  In the normal course of their businesses, the Debtors obtain Utility Services provided by several entities (each a "Utility Company" and collectively, the "Utility Companies"), including those identified in the nonexclusive list attached hereto as Exhibit A (the "**Utilities List**").[4]  The Utility Companies do not include parties that are obligated to provide services to the Debtors pursuant to the terms of a contract.

67.     By the Utilities Motion, the Debtors also seek authority from the Court to continue such payments for postpetition services (together with payments to Utility Providers for Utility Services, the "**Utility Obligations**").

68.     Uninterrupted Utility Services are essential to the Debtors' ongoing operations, and, therefore, to the success of the Debtors' reorganization efforts. Indeed, any disruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' continued operations. The Debtors operate a complex business with operations in several states around the country that depend on the reliable delivery of power and other Utility Services. Should any Utility Provider refuse or discontinue service even for a brief period, the Debtors' operations could be severely disrupted. Such a disruption would negatively impact the Debtors' business operations and revenue and could jeopardize the Debtors' reorganization efforts and, ultimately, creditors'

---

[4]    For each Utility Company, Exhibit A of the Utilities Motion identifies: (a) the name and address of the Utility Company; (b) the service provided and to which Debtor; (c) the account number under which the Utility Company provides the service; and (d) the average amount due to each Utility Company per month.  The inclusion of any entity on, as well as any omission of any entity from, Exhibit A is not an admission by the Debtors that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights with respect thereto.  In addition, the Debtors are requesting that this Motion apply to all of the Debtors' Utility Companies, whether or not such Utility Company is included on Exhibit A.  The Debtors have proposed a procedure for supplementing the list of Utility Companies on Exhibit A.

recoveries. In addition to their corporate headquarters, the Debtors operate several regional and field offices responsible for ensuring the smooth operation of the Debtors' businesses. These offices require Utility Services to operate.

69.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to manage their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the Utilities Motion should be approved.

### E.  Customer Programs Motion

70.     Prior to the Petition Date, in the ordinary course of business, the Debtors engaged in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain a positive reputation for their services and (ii) designed to attract new customers and to enhance loyalty and sales among the Debtors' existing customer base. These customer-targeted practices (collectively, the "**Customer Programs**") include, but are not limited to, those practices described in the following paragraphs.

71.     **<u>Starion Rewards Program</u>**. The Debtors, through a third-party processor, operate the Starion Rewards Program, whereby customers earn rewards to be used to save on shopping, dining, groceries, travel, and entertainment.

72.     The Debtors' failure to honor prepetition customer obligations related to the Customer Programs, for even a brief time, may well drive away valuable customers, harming the Debtors' efforts to maximize the value of their inventory. Accordingly, I believe that the Debtors must be authorized to continue the Customer Programs.

**F. Insurance Motion**

73.     The Debtors seek entry of an order authorizing, but not directing, the Debtors to continue and, to the extent necessary, revise, extend, renew, supplement, or change their prepetition Insurance Policies, or enter into new policies, if necessary, in the ordinary course of business and pay all prepetition obligations in respect thereof, including brokerage and administrative fees (collectively, the "**Insurance Policy Obligations**").

74.     In connection with their business operations, the Debtors maintain multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations. The Insurance Policies include property and general liability, employment benefits liability, workers' compensation liability, employment practices liability, commercial property liability, crime, cyber, business auto, errors & omissions, directors and officers liability, fiduciary liability, and commercial umbrella.

75.     The total annual premiums under the current Insurance Policies are approximately $215,312.00, including all related fees and charges.

76.     The Debtors do not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies. In an abundance of caution, the Debtors seeks authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $10,000.00 and to continue to pay postpetition costs with respect to the Insurance Policies in the ordinary course of business during the pendency of these Cases.

77.     The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations. Moreover, I

understand that maintenance of insurance policies is required by the operating guidelines established by the Office of the United States Trustee. If the Debtors fail to perform their obligations under the Insurance Policies and Financed Programs, their coverage thereunder could be voided. The Debtors may also need to renew or replace certain of the Insurance Policies during the course of these Cases, or enter into new policies. If the Debtors do not pay prepetition amounts owing in respect of the Insurance Policies, there is a risk that the Insurance Carriers will refuse to renew the Insurance Policies.

78.     For the reasons already set forth herein and in the Insurance Motion, I believe the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors, for the Debtors to operate their business without interruption, and to preserve value for the Debtors' estates.

**G. Taxes Motion**

79.     The Debtors request that the Court authorize (a) the Debtors to pay certain prepetition taxes, including, sales and use taxes, property taxes, franchise taxes, and similar taxes and fees in the ordinary course of business, as the Debtors, in their sole discretion, deem necessary, and (b) authorize the banks and financial institutions at which the Debtors' bank accounts are maintained (the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing.

80.     In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use, personal property, franchise, commercial activity, business and occupation, and various other taxes, fees, charges, and assessments (the "**Taxes and Fees**"). The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "**Taxing Authorities**") in connection with the operation of their business and the

sale of electricity and natural gas. The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid. As of the Petition Date, the Debtors estimate that it owed approximately $240,000.00 in unremitted Taxes and Fees, all of which is comprised of current tax obligations.

81. The Debtors authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities; provided that payments on account of Taxes and Fees that accrued, in whole or in part, prior to the Petition Date but were not in fact paid or processed prior to the Petition Date shall not exceed $240,000.00 in the aggregate.

82. Any regulatory dispute or delinquency that impacts the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole and on the value of their estates. Specifically, the Debtors' failure to remit the Taxes and Fees could adversely affect the Debtors' business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtors or seek to prevent the Debtors from continuing their business and administering their estates, which, even if unsuccessful, would unnecessarily divert the Debtors' attention from the process of maximizing the value of the estates; (b) the Taxing Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates; (c) some of the Taxing Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtors do not pay the Taxes and Fees; and (d) certain of the Debtors' directors, officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on their part, which would undoubtedly distract these key people from their duties related to the Cases.

83.     Further, the Debtors' payment of the Taxes and Fees is an exercise of sound business judgment and is necessary to maximize the value of the Debtors' estates for the benefit of creditors. Any disputes with taxing authorities could adversely affect their ability to conduct business in a particular jurisdiction and have wide-ranging and negative effects on the Debtors' operations as a whole and their efforts to efficiently administer the estates and maximize distributions to their creditors. If the Debtors do not continue paying the Taxes and Fees when they come due on a timely basis, it is possible that Taxing Authorities, or those parties who ordinarily collect the Taxes and Fees, may interfere with the Debtors' business and the efficient administration of the estates.

### H. Critical Vendor Motion

84.     The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay the prepetition claims of certain vendors that are critical to the Debtor's operations, as more fully described herein (the "**Critical Vendor Claims**") up to $997,500.00 on an interim and final basis.

85.     The Debtors have a number of key relationships with vendors who provide essential goods and/or services (the "**Critical Vendors**"). Specifically, in the nature of the Debtors, business and as further detailed in the First Day Declaration, the Debtors maintain key relationships with various independent system operations ("ISO") allowing the Debtors to distribute power to consumer. The Debtors' key vendors and the relationship therewith are as follows:

- In New England, the Debtors maintain a relationship with ISO New England.

- The Debtors have a contract with Emera Energy Services to purchase the power load required to service its electricity supply to customers in Connecticut and Massachusetts.

- The Debtors purchase power directly through the NY ISO for the power load required to serve its electric power customers in New York. The Debtors purchase power directly from PJM ISO for the power load required to serve its electrical power customers in Delaware, the District of Columbia, Illinois, Maryland, New Jersey, Ohio and Pennsylvania.

- The Debtors have a contract with Cima for its natural gas purchases required to serve the Debtors' natural gas supply customers.

86.     The Debtors believe that if they cannot continue the relationships with the current Critical Vendors, it may be impossible to continue doing business. Specifically, all the above-mentioned ISOs have strict payment deadlines and missing the payment deadline, even by minutes constitutes an "event of default" under the governing agreements. Such an event of default triggers notices to all members of the ISO, and as the length of time of the default lengthens, the potential penalties grow, with the ultimate penalty being the disqualification as a member and seizure of the financial assurance accounts. Further, an uncured event of default at the ISO level triggers the consequence of having all the Debtors' customers (within the applicable ISO) being removed from the Debtors for supply services and returned to the incumbent utility in the particular territories. Such defaults are tracked and reported in trade press releases causing determinate consequences for the Debtors.

87.     In any event the amount of capital required to obtain similar goods or comparable services (if at all possible after a default) would be much greater than the combined total of making payment on the past due amounts to the Critical Vendors and the likely payment required for postpetition work.

88.     The Debtors believe that they must continue to receive the services provided by the Critical Vendors in order to achieve a successful reorganization.  In some cases, the Debtors believe that absent payment of prepetition amounts due Critical Vendors may refuse to deliver any goods and services on an on-going basis even if the Debtors can pay postpetition amounts due.

89.     Ultimately, the Debtors believe that their ability to continue operations at the efficient and high-quality levels needed to reorganize successfully will largely depend on the continued participation of the Critical Vendors.  The Debtors, along with their restructuring advisors, have performed an analysis of the Critical Vendor Payments necessary to avoid potentially significant disruptions to the Debtors' business operations.  The Debtors believe that a fund of $997,500.00 in the aggregate should provide the flexibility

necessary for the Debtors to receive the vital goods and/or services they require to continue being successful as a reorganized entity.

I declare under penalty of perjury that, to the best of my knowledge after reasonable inquiry, the foregoing is true and correct.

Dated: November 14 , 2018