**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| STARION ENERGY, INC., et al.,[1] | Case No. 18-12608 (MFW) |
| Debtors. | Jointly Administered |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
AUTHORIZING POSTPETITION FINANCING**

Starion Energy, Inc., et al., the above-captioned debtors and debtors in possession (the

"**Debtors**"), move (the "**Motion**") this Court for entry of interim (the "**Interim Order**") and final

("the **Final Order**") orders authorizing the Debtors to obtain secured postpetition debtor in

possession financing (the "**DIP Financing**") up to an aggregate principal amount of $6,000,000,

pursuant to the terms set forth in the proposed Interim Order attached as Exhibit A and the Debtor

in Possession Credit Agreement, in substantially the form attached as Exhibit B (the "**DIP Credit**

**Agreement**" and together with all other Loan Documents, the "**DIP Financing Agreements**"),[2]

by and between the Debtors and GF Star IV, LLC (the "**DIP Lender**") and request that the Court

schedule, pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

**Rules**"), a final hearing (the "**Final Hearing**") for the Court to consider entry of the Final Order

authorizing and approving on a final basis the relief requested in this Motion.  In support hereof,

---

[1]  The Debtors and the last four digits of their respective tax identification numbers are: Starion Energy Inc. (0943); Starion Energy NY Inc. (4319); Starion Energy PA Inc. (1201). The Debtors' corporate headquarters is located at, and the mailing address for each Debtor is, 751 Straits Turnpike, Suite 2000, Middlebury CT 06762, Attn: Alexandrea Isaac, Esq.

[2] Capitalized terms not otherwise defined in this Motion shall have the meaning s ascribed to them in the DIP Financing Agreements.

the Debtors rely on the *DIP Declaration of Thomas Stiner* (the "**DIP Declaration**"), and in further

support of this Motion, the Debtors respectfully represent and set forth as follows:

**Background**

1.     On November 14, 2018 (the "**Petition Date**"), the Debtors filed voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The

Debtors continue to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been

appointed in these chapter 11 cases. As of the date hereof, no creditors' committee has been

appointed.

2.     The Debtors are a leading supplier of electricity and natural gas offering

competitive solutions to residential and business customers in restructured energy markets

allowing customers to shop among competitive and alternative options for their energy supply

service.

3.     The circumstances leading to the filing of this case are set forth in the First Day

Declaration filed in this case at Docket Number 4.  One critical factor leading to the filing was the

commencement of an action on October 15, 2018 by the Commonwealth of Massachusetts (the

"**Commonwealth**") against Debtor Starion Energy, Inc. and others in the Superior Court of

Massachusetts, Civil Action No. 18-3199H.  Contemporaneously with the filing of their complaint,

the Commonwealth filed an Emergency Motion for Attachment on Trustee Process to attach assets

of Debtor Starion Energy, Inc. held by NSTAR Electric Company d/b/a Eversource Energy

("**Eversource**") and Massachusetts Electric Company d/b/a National Grid ("**National Grid**")

which the Superior Court granted on a temporary basis.

4.      On October 24, 2018, the Superior Court granted the Commonwealth's Motions, ordering that the injunction will remain in full force and effect until November 12, 2018 at 5:00 PM or further order of the court. On November 13, 2018, the court issued a Second Extension ordering that the injunction will remain in full force and effect until November 16, 2018 at 5:00 P.M. or by further order of the court.

5.      As of November 5, 2018, National Grid held $2,478,936.33 of Starion's assets, and Eversource held $1,094,162.02 in Starion's assets. Thus, as of November 5, 2018, a total of $3,573,098.35 in Starion's assets were being held.  As of the Petition Date, that amount was close to $4.0 million (the **"Held Funds"**).

6.      The grant of the attachment and injunction against payment of Starion's funds in the possession of National Grid and Eversource has put severe strain on Starion and has the potential to significantly affect ongoing operations.  Starion must purchase energy on the wholesale market in order to supply energy to its customers.  The approximate monthly cost for Starion to purchase this energy varies by month and totaled $17.8 million for the first eight months of 2018 for Massachusetts customers alone, excluding the costs of Renewable Energy Certificates. Starion must use the funds it receives to pay the millions of dollars in costs each month required to purchase wholesale energy.

7.      Without the use of the Held Funds in its ordinary course of business, the Debtors face a potential shortfall of meeting their obligations when due. While the Budget attached hereto projects an eventual ability to overcome this shortfall, the Debtors require sufficient liquidity to ensure that they will meet their obligations.   In addition, as the Debtors are principally situated in an industry that has swings based on external events, such as extreme cold or hot temperatures, adequate access to additional capital is required to ensure the required energy needs of its customers can be met

without interruption.  Leading into the winter season with a business principally serving customers in colder climates, the additional access to cash is necessary.

**Facts Specific to the Relief Requested**

8.      As described in the DIP Declaration, as a result of the significant detrimental effect to the Debtors should service to its customers be interrupted, the Debtors have determined that the DIP Financing, coupled with cash flow from post-petition operations, will permit the Debtors to adequately supplement their cash position to ensure funding of the administration of this chapter 11 case, thereby allowing the Debtors to implement an efficient and orderly plan of reorganization. Without the DIP Financing, the Debtors could face a liquidity shortfall and may lack the capital necessary to confirm a plan of reorganization.

## I.    The Debtors' Prepetition Indebtedness

9.      Prior to the filing of these bankruptcy cases, the Debtors had modest secured credit facilities with Key Bank NA and GF Star IV, LLC.   In the months leading up to the Petition Date, the Debtors had fully satisfied these credit facilities and as a result do not have pre-petition secured debt.

10.      To ensure full disclosure of the relationship of GF Star IV, LLC, who is also the proposed post-petition lender, GF Star IV, LLC, had provided a loan in the amount of $6,000,000, which was fully satisfied on October 24, 2018.[3]   As part of the pre-petition financing with GF Star IV, LLC, the lender was granted an option to obtain 189,605 shares of the Debtors.   At no time has GF Star IV, LLC elected the share option.  GF Star IV, LLC and/or its officers, managers, members and agents are not insiders of the Debtors. Likewise, the Debtors, their officers, directors, shareholders and agents are not insiders of GF Star IV, LLC.

---

[3] The filing of the Commonwealth action triggered a demand by GF Star IV, LLC for payment in full under the pre-petition loan documents which the Debtors then satisfied the outstanding obligations thereunder.

**II.      The Debtors' Efforts to Obtain DIP Financing**

11.      In connection with the planning for this chapter 11 case, the Debtors reviewed projected cash flows under the scenarios where the Held Funds were delivered to the Debtors and another scenario where such return of the Held Funds was further delayed.  In the latter scenario, the Debtors understood that access to a post-petition credit facility would be an important and necessary tool in ensuring their continued operation as a debtors in possession.

12.      As set forth in greater detail in the *DIP Declaration* attached as Exhibit C, in addition to seeking financing proposals from the DIP Lender, the Debtors reviewed their options for obtaining additional financing whether via traditional financial institution lenders and alternative lenders within this industry to determine whether they would be interested in providing the Debtors with alternative debtor in possession financing.  Recognizing that no parties would be willing to provide financing in the form of unsecured credit repayable as an administrative expense under section 503(b) of the Bankruptcy Code, nor under the terms of sections 364(a) or 364(b) of the Bankruptcy Code, the Debtors discussed with their pre-petition lenders the prospect of a new loan on a post-petition administrative priority basis.  While those parties continued to have discussions, no agreement was reached prior to the Petition Date.

13.      Following the first day hearing in which it was determined that the Held Funds were going to remain in escrow pending a further hearing on December 17, 2018, the Debtors again reached out to the DIP Lender for post-petition financing.  Negotiations ensued and formed the basis of the agreement for which the Debtors seek interim and final approval.

14.      The Debtors therefore seek authorization from the Court to enter into the DIP Credit Agreement in order to obtain the DIP Financing on an interim basis and final basis.

## III.   DIP Credit Agreement

15.     Both prior to and following the Petition Date, the Debtors engaged in good faith, arm's-length negotiations with the DIP Lender, leading to the terms and conditions contained in DIP Credit Agreement. The significant terms of the DIP Credit Agreement are as follows:

| Local Rule Requirement | Description of Provision |
|---|---|
| **Borrowers** <br><br> (Local Rule 4001-2(a)(ii)) | Starion Energy, Inc., Starion Energy PA, Inc., Starion Energy NY, Inc. |
| **Guarantors** <br><br> (Local Rule 4001-2(a)(ii)) | Ruzhdi Dauti, Ardita Dauti, Sevdi Dauti, Floresha Dauti, Fitor Mamudi, Melissa Mamudi, Dashmir Murtishi, Suzanna Murtishi, Robert Zappone and Michaele Zappone. |
| **DIP Lender** <br><br> (Local Rule 4001-2(a)(ii)) | GF Star IV, LLC |
| **Administrative Agent** <br><br> (Local Rule 4001-2(a)(ii)) | n/a |
| **Commitment/Availability** <br><br> (Local Rule 4001-2(a)(ii)) | $6,000,000 |
| **Priming** <br><br> (Local Rule 4001-2(a)(ii)) | N/A |
| **Use of Proceeds** <br><br> (Local Rule 4001-2(a)(ii)) | Business operations as needed. |
| **Maturity Date** <br><br> (Local Rule 4001-2(a)(ii)) | Promissory Note, December 31, 2019 |
| **Termination Date** <br><br> (Local Rule 4001-2(a)(ii)) | N/A |
| **Interest Rate** <br><br> (Local Rule 4001-2(a)(ii)) | 15% |
| **Default Interest** <br><br> (Local Rule 4001-2(a)(ii)) | N/A |

| | |
|---|---|
| **Fees**<br><br>(Local Rule 4001-2(a)(ii)) | Closing Costs  (Section 2.3 of DIP Credit Agreement) |
| **Security**<br><br>(Local Rule 4001-2(a)(ii)) | All Assets (as defined in the Security Agreement). |
| **Priority**<br><br>(Local Rule 4001-2(a)(ii)) | Priority pursuant to 11 U.S.C. §§ 364(c)(1), (c)(2), (c)(3). |
| **Adequate Protection**<br><br>(Local Rule 4001-2(a)(i)(E)) | N/A. |
| **Cross-Collateralization**<br><br>(Local Rule 4001-2(a)(i)(A)) | N/A |
| **Section 552(b)**<br><br>(Local Rule 4001-2(a)(i)(E)) | Paragraph 26 Interim Order. |
| **Carve Out**<br><br>(Local Rule 4001-2(a)(i)(F)) | Section 1.1 of DIP Credit Agreement. US Trustee fees, Debtors and committee (if any) professional fees and expenses. |
| **Budget**<br><br>(Local Rule 4001-2(a)(ii)) | Attached hereto as Exhibit D. |
| **Cash Collateral**<br><br>(Local Rule 4001-2(a)(ii)) | N/A |
| **DIP Collateral**<br><br>(Local Rule 4001-2(a)(ii)) | Post-petition Assets as defined in the Security Agreement. |
| **Covenants**<br><br>(Local Rule 4001-2(a)(ii)) | Section 6 and 7 of DIP Credit Agreement |
| **Events of Default**<br><br>(Local Rule 4001-2(a)(ii)) | Section 8 of DIP Credit Agreement. |
| **Release,    Waivers,    or Limitation of Rights**<br><br>(Local Rule  4001-2(a)(i)(B), (C) | N/A |
| **Avoidance Actions**<br><br>(Local Rule 4001-2(a)(i)(D) | Security Agreement – DIP liens will only encumber Avoidance Actions upon entry of Final DIP Order. |

**Jurisdiction**

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

**Proposed Adequate Protection and Use of Cash Collateral**

17.     In this instance because the Debtors carried no pre-petition secured debt, no adequate protection or approval for use of pre-petition cash collateral is necessary.

**Basis for Relief**

18.     Absent the relief requested herein, the Debtors' ability to conduct business in the ordinary course would be jeopardized. The Debtors may face interrupted service to customers which would be an immediate loss of customers and therefore an immediate reduction in value of the property of the estate.

**I.     Approval Under Section 364(c) of the Bankruptcy Code**

19.     The Debtor proposes to obtain the DIP Financing by providing to the DIP Lender security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.

20.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). Section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit

allowable as an ordinary administrative claim. See In re L.A. Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

21.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable and adequate, given the circumstances of the Debtor and the proposed lender.

L.A. Dodgers, 457 B.R. at 312; see In re Ames Dep't Stores, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991). As is fully set forth below the Debtors have satisfied each of these conditions.

II.    **The Debtors Do Not Have an Alternative to the DIP Financing**

22.    As set forth above, and as the Debtors will show at the Interim Hearing, financing of the type and in the amount needed in this case was not obtainable on an unsecured basis. There were no potential sources of postpetition financing for the Debtors, available on an expedited basis and on reasonable terms, because, among other reasons, there is significant pending litigation against the Debtors who are in a bankruptcy proceeding.  In these circumstances, "[t]he statute

imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see In re Phoenix Steel Corp., 39 B.R. 218, 222 (D. Del. 1984) (concluding the debtor satisfied its burden to show an inability to obtain credit on other terms through time and effort); see also Ames Dep't Stores, 115 B.R. at 37.

23.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code. Snowshoe, 789 F.2d at 1088; see In re Antico Mfg. Co., 31 B.R. 103, 105 (Bankr. E.D.N.Y. 1983). Moreover, where there are few lenders likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). Thus, the evidence introduced at the Interim Hearing to consider the relief requested in the Interim Order will satisfy the requirement of section 364(c) of the Bankruptcy Code that alternative credit was not available on an unsecured basis allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code.

### III.    The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates

24.     The Debtors need immediate access to financing. Access to substantial credit is necessary to meet the day-to-day costs associated with operating the Debtors' businesses and preserving value.  Access to sufficient cash is therefore critical to the Debtors. A loss of confidence among suppliers, customers, employees and other interested parties in the Debtors' ability to access credit at this crucial time would have a material adverse impact on the Debtors' operations and its overall value.

25.     For these reasons, immediate access to the funds available under the DIP Credit Agreement is critical to the Debtors. The ongoing smooth operations of the business demands that the Debtors not be delayed in receiving the beneficial effects of the DIP Financing; any substantial delay could have the same impact as denial of this Motion.

**IV.     The Terms of the DIP Credit Agreement Are Fair, Reasonable, and Appropriate**

26.     The DIP Financing reflects the exercise of the Debtors' sound and prudent business judgment. As described above, the Debtors were not able to obtain alternative financing on an unsecured basis, nor were they able to obtain any financing on terms as favorable as the terms negotiated with the DIP Lender. Thus while there is no pre-petition secured debt, this financing is important to the company and the terms are reasonable in light of the necessity of the additional funding.  In the Debtors' business judgment, the DIP Financing is the best option available for the Debtors to obtain much-needed liquidity in the circumstances of this chapter 11 case.

27.     The DIP Credit Agreement provides that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve Out. In Ames Dep't Stores, 115 B.R. at 40, the bankruptcy court found that such "carve outs" are not only reasonable, but are necessary to ensure that official committees and Debtors' estates will be assured of the assistance of counsel.  Further, ensuring payment of US Trustee quarterly fees also demands this necessity.

28.     The terms and conditions of the DIP Credit Agreement are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. The interest rate under the DIP Credit Agreement is within the range of market rates and fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the DIP Collateral, and the business risks associated with lending to the Debtors in these chapter 11 cases. Because the DIP Credit Agreement has been negotiated in good faith and at arm's-length and no consideration is being provided to any party

for obligations arising under the DIP Credit Agreement, other than as disclosed therein, the

Debtors request that the DIP Credit Agreement be accorded the benefits of section 364(e) of the

Bankruptcy Code.

**V.       Application of the Business Judgment Standard**

29.      As described above, after appropriate investigation and analysis, and given the

exigencies of the circumstances, the Debtors' management has concluded that alternative credit of

the type and in the amount required by the Debtors are not available on an unsecured basis.

Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions,

including the decision to borrow money, unless such decision fails the arbitrary and capricious

standard. See Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.),

163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility,

and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable

under the circumstances and in the best interest of [the debtor] and its creditors"); In re After Six,

Inc., 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (debtor "is entitled to some free reign in fulfilling

its perceived mission of . . . keeping an ongoing business afloat"). Indeed, "[m]ore exacting

scrutiny [of the debtor's business decisions] would slow the administration of the Debtor's estate

and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate and threaten the court's ability to control a case impartially." Richmond

Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

30.      In general, a bankruptcy court defers to a debtor's business judgment regarding the

need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re

Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); see After Six, 154 B.R. at

882-83. Courts generally will not second guess a debtor's business decisions when those decisions

involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." Curlew Valley Assocs., 14 B.R. at 513-14 (footnote omitted).

31.    The Debtors have exercised sound business judgment in determining that the DIP Financing is not only appropriate, it is necessary. Furthermore, the Debtors have satisfied the legal prerequisites to borrow under the DIP Credit Agreement. The terms of the DIP Credit Agreement are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtors should be granted authority to enter into the DIP Credit Agreement, and borrow funds on the secured basis described above, establish that they should be granted the authority to pursuant to section 364(c) of the Bankruptcy Code, and to take the other actions contemplated by the DIP Credit Agreement and as requested herein.

32.    Without the liquidity provided by the DIP Credit Agreement, the Debtors may be unable to pay suppliers, employees, and other constituencies that are essential to the operation of the business in the ordinary course. The Debtors' management has exercised its best business judgment in negotiating the DIP Credit Agreement that is presently before the Court.

**VI.    Request for Modification of Automatic Stay**

33.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Credit Agreement contemplates a modification of the automatic stay (to the extent applicable), to permit the exercise of all rights and remedies provided for in the DIP Credit Agreement upon the occurrence and during the continuation of any Event of Default, provided that prior to the exercise of any enforcement remedies against the DIP Collateral, the DIP Lender shall be required to give five (5) days' notice to the Debtors, any official unsecured creditors' committee's counsel, and the U.S. Trustee as provided for in section 3 of the proposed

Interim Order. Provisions of this kind allowing for a modification of the automatic stay are typically features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

## VII.    Request for Immediate Interim Relief

34.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 14 days after the service of such motion. Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion, and to authorize the obtaining and use of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985). After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See id. at 449; Ames Dep't Stores, 115 B.R. at 36.

35.    Pending the Final Hearing, the Debtors require immediate use of a portion of funds provided for in the DIP Credit Agreement for, among other things, the Debtors' working capital needs. It is essential that the Debtors immediately have the ability to pay for postpetition expenses, as well as the prepetition expenses approved in the various first-day orders pending before this Court, to minimize the damage occasioned by their constrained liquidity.

36.    Absent immediate use of a portion of the DIP Financing, the Debtors may become unable to pay ongoing operational expenses and will not be able to continue to make payments to key constituencies, such as employees, that will be integral to the ordinary operation of the Debtors'

businesses. Consequently, if interim relief is not obtained, the Debtors' assets will be jeopardized immediately and irreparably harmed, to the detriment of the Debtors' estates, their creditors, and other parties in interest.

37.    As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient to effectuate the sale of its operations. Without the DIP Financing, the Debtors' objective of reorganizing these companies may fail. The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated by well-represented parties in good faith and at arm's-length. In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the Debtors respectfully submit the granting of the relief requested by this Motion is warranted.

## Notice

38.    Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) the 20 largest unsecured creditors of the Debtors; (c) any other entity asserting recorded liens against any of the Debtor's assets, and their counsel, if known; (d) the Internal Revenue Service and (e) any party filing a notice pursuant to Bankruptcy Rule 2002; and in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Rules. The Debtors respectfully submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order, substantially in the form attached hereto as Exhibit A, granting the relief requested in this Motion on an interim basis and such other and further relief as may be just and proper.

*(Signature page to follow)*

GELLERT SCALI BUSENKELL & BROWN LLC

*/s/ Ronald S. Gellert*
Michael Busenkell (DE 3933)
Ronald S. Gellert (DE 4259)
Evan W. Rassman (DE 5077)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
Phone: 302-425-5800
mbusenkell@gsbblaw.com
rgellert@gsbblaw.com
eerassman@gsbblaw.com

*Proposed Counsel for Debtors and Debtors-in-Possession*